**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| SANDRA I. SANTIAGO, | CASE NO. 1:20-CV-01796-DAP |
| Plaintiff, | JUDGE DAN AARON POLSTER |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

## INTRODUCTION

Plaintiff Sandra I. Santiago filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision denying disability insurance benefits ("DIB"). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On August 13, 2020, pursuant to Local Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a report and recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry dated May 25, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Ms. Santiago filed for DIB on April 9, 2018, alleging a disability onset date of October 31, 2016. (Tr. 181). Her claims were denied initially and upon reconsideration. (Tr. 61-71, 73-84). She then requested a hearing before an administrative law judge. (Tr. 100). Ms. Santiago (represented

1

by counsel and accompanied by a Spanish-English interpreter), and a vocational expert ("VE")

testified at a hearing before the ALJ on June 11, 2019. (Tr. 33-60). On July 15, 2019, the ALJ

found Ms. Santiago not disabled in a written decision. (Tr. 15-32). The Appeals Council denied

Ms. Santiago's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1-8; *see also* 20 C.F.R. §§ 404.955, 404.981). Ms. Santiago timely filed this

action on August 13, 2020. (ECF #1).

## FACTUAL BACKGROUND

### I.  PERSONAL AND VOCATIONAL EVIDENCE

Ms. Santiago was 50 years old at the time of her amended alleged onset date, and 53 years

old at the time of the administrative hearing. (Tr. 61). Ms. Santiago has an Associate's degree and

last worked in 2016. (Tr. 37-38). She previously worked as a customer complaint clerk at a call

center, as check cashier for All Kinds of Check Cashing, and as a bank teller for Lorain National

Bank. (Tr. 38-39).

### II.  ADMINISTRATIVE HEARING

The following summarizes the testimony of Ms. Santiago and VE Deborah A. Lee

presented during the hearing before the ALJ.

Ms. Santiago has carpal tunnel issues. (Tr. 41). Her hands fall asleep and tingle, so she is

unable to hold or handle items. (Tr. 41-42). She experiences tingling hands every single day for

periods of time. (Tr. 45). Sitting for extended periods of time aggravates the tingling in her hands.

(Tr. 41). When Ms. Santiago's hands fall asleep, she is unable even to staple papers together. (Tr.

42). Ms. Santiago also has constant neck pain and low back pain. (Tr. 43). She takes medications

for pain control, but they are minimally effective. (*Id.*). Ms. Santiago has received injections and

2

went to physical therapy for her neck and back impairments. (Tr. 44). Ms. Santiago also experiences pain when lifting her right arm over her head. (Tr. 47). When she stretches her right arm in front of her, she feels pain similar to getting a shot, but it runs from her arm to her neck. (Tr. 48).

Ms. Santiago has difficulty dressing herself. (Tr. 45). If she must lift her arms up to get dressed, she asks for help. (*Id.*). Ms. Santiago can button buttons and zip zippers when her hands are not asleep. (Tr. 45). Ms. Santiago can bathe and brush her teeth on her own but is unable to do her hair; she relies on her daughter for help. (*Id.*). Ms. Santiago's husband helps with the household chores, particularly with lifting. (Tr. 46). For example, while Ms. Santiago can put a load of laundry into the washing machine, her husband must remove the heavy, wet clothing from the washer and place it into the dryer. (*Id.*). Lifting causes Ms. Santiago tremendous pain in her neck, waist, and hand. (*Id.*). Ms. Santiago can drive but she only does so when strictly necessary because she has limited range of side-to-side motion in her neck and fears she will cause an accident because she cannot turn her head. (Tr. 47).

The VE then testified. As to Ms. Santiago's past relevant work, the VE testified the call center and customer service representative positions are sedentary, but Ms. Santiago performed the customer service representative position at the light exertion level because she stood all day. (Tr. 49). The VE classified her bank teller position as light exertion. (Tr. 50).

The ALJ posed the following hypothetical and asked the VE to determine if such an individual could perform Ms. Santiago's past relevant work: limited to light work; can frequently reach with the right upper extremity; can frequently perform fine and gross manipulation with the right upper extremity; can occasionally climb ramps and stairs; can never climb ropes, ladders, or

3

scaffolds; can frequently kneel, crouch, and crawl; and must avoid concentrated exposure to hazards such as industrial machinery and unprotected heights. (*Id.*). The VE testified that such an individual can perform the call center and customer service positions but not the bank teller position. (*Id.*). If the hypothetical individual is limited to a sedentary exertion level and to occasional reaching, fingering, and handling with the dominant right hand, that individual can perform the call center position. (Tr. 52). A limitation to less than occasional reaching, handling, and finger with the right arm eliminates the call center position. (Tr. 54).

The VE testified that, in her experience, individuals with limited range of motion in the neck and difficulty turning their head side-to-side would not have a problem looking at a computer screen fixed in front of them and would be able to perform the call center position. (Tr. 53).

The VE also testified to an employer's tolerances. An employer tolerates about one absence per month and 20% time off-task per workday. (Tr. 56).

## III.    RELEVANT MEDICAL EVIDENCE

Ms. Santiago's cervical spine x-ray, dated May 21, 2016, showed minimal grade 1 retrolisthesis of C4-C5 and C5-C6 with disc space narrowing, minimal at C4-C5 and mild at C5-C6. (Tr. 276). The x-ray also revealed endplate osteophyte formation at C5-C6. (*Id.*). A view of the right shoulder showed possible calcific tendinitis of the supraspinatus tendon without significant degenerative changes or evidence of fracture or dislocation. (*Id.*).

Ms. Santiago saw Christina Zarate Kolp, M.D., on September 20, 2016 to establish treatment as a patient. (Tr. 317). She complained of daily leg swelling that began in the morning and worsened throughout the day with being on her feet. (Tr. 318). Ms. Santiago explained that this swelling happened last August but was worse this year. (*Id.*). The swelling decreased when she

4

elevated her feet. (*Id.*). Physical examination revealed pitting edema to the knees bilaterally but was otherwise normal. (Tr. 320). Dr. Kolp felt this was likely secondary to vascular insufficiency. (Tr. 321). She ordered labs and recommended compression stockings and a low sodium diet. (*Id.*).

Ms. Santiago followed up with Dr. Kolp on October 1, 2016. She was recovering from bronchitis at the time and her cough had improved. The doctor noted Ms. Santiago did not have any other complaints that day. (Tr. 313). Her physical examination was normal. (Tr. 315).

Ms. Santiago had an annual exam with Dr. Kolp on October 30, 2017, at which she complained of right-sided neck pain that had worsened over the course of a few months, accompanied by right arm numbness and weakness, and right knee pain. (Tr. 305-06). She was tender to palpation along the mid and lower cervical spinous process and on right-sided neck musculature from below the occipital area and out to her shoulder. (Tr. 307). Physical examination also revealed a positive Spurling's test on the right, indicating nerve compression. (Tr. 308). Dr. Kolp ordered a neck x-ray, prescribed a Medrol pack, instructed Ms. Santiago to use over-the-counter anti-inflammatories, and referred her to physical therapy. (Tr. 309). The neck x-ray, dated November 3, 2017, revealed cervical spondylosis, mild at C4-C5 and C6-C7, moderate at C5-C6, and multilevel hypertrophic facet arthrosis bilaterally. (Tr. 335-36).

Ms. Santiago saw Dr. Kolp on November 7, 2017 and complained of right knee pain and instability that had progressed over two years. (Tr. 299). She related daily pain, felt in the joint, without injury, swelling, or bruising. (*Id.*). Ms. Santiago also claimed difficulty with bending down and crossing her legs. (*Id.*). Dr. Kolp noted a normal knee examination except for mild tenderness to palpation of the medial/lateral joint line. Ms. Santiago displayed a normal gait and her lower extremity sensation remained intact. (Tr. 301). Dr. Kolp ordered a knee x-ray and provided Ms.

5

Santiago with a prescription for Mobic and a referral to physical therapy. (*Id.*). The x-ray showed normal alignment without fracture or subluxation, but with mild joint space narrowing throughout the knee. (Tr. 285).

On November 13, 2017, Dr. Kolp gave Ms. Santiago a cortisone injection in her right knee to alleviate chronic knee pain and recommended physical therapy. (Tr. 296).

Ms. Santiago returned to Dr. Kolp on February 3, 2018 with complaints of congestion and cervical neck pain with right arm tingling and some weakness. (Tr. 292). Dr. Kolp noted a cervical spine x-ray from November 2017 showing degenerative change. The doctor referred Ms. Santiago to a specialist. (*Id.*).

On April 6, 2018, Ms. Santiago saw Edwin Capulong, M.D., for hand paresthesia. (Tr. 375). Ms. Santiago complained of worsening neck pain with radiation into both shoulders, and to her upper right arm, with associated numbness. (Tr. 375). He noted the fourth digit of her left hand was clinched, which Ms. Santiago explained had to be bent into position each morning. (Tr. 375). Ms. Santiago also complained of a burning sensation on her right forearm and diminished right-handed grasp. (Tr. 375). Lifting any object aggravated the numbness and tingling sensations. (*Id.*).

Her physical examination was normal except for abnormal range of motion in her right shoulder with abduction and forward flexion, and right-hand paresthesia with shoulder abduction. (Tr. 378). Dr. Capulong ordered eight weeks of physical therapy and an EMG study, and prescribed gabapentin to address Ms. Santiago's nerve pain. (Tr. 379).

On June 19, 2018, Ms. Santiago returned to Dr. Capulong's office and complained that her neck and shoulder pain was spreading to her lower back. (Tr. 381). She explained that her pain

medications take the edge off but do not completely relieve her pain. (*Id.*). Physical examination was normal, showing full cervical spine and shoulder range of motion, normal gait, and full upper and lower extremity strength. (Tr. 383). Ms. Santiago's EMG study was positive for carpal tunnel syndrome on the right side. (Tr. 384, 344-46). Dr. Capulong ordered a cervical spine MRI. (Tr. 384).

At her next appointment with Dr. Capulong on July 31, 2018, Ms. Santiago complained of worsening cervical radiculopathy, right arm numbness/tingling sensation into her fingers, painful right forearm, and some numbness and tingling in her left upper arm. (Tr. 385). She explained the gabapentin did not address her symptoms. (Tr. 385). On physical examination, Ms. Santiago had tight cervical paraspinal and trapezius muscles on the right side. (Tr. 387).

Ms. Santiago's cervical MRI from August 9, 2018 showed cervical spondylosis with associated small bulging discs, uncovertebral joint osteophytes, and facet hypertrophy, but no canal stenosis, focal disc herniation, cord compression, or nerve root compression. (Tr. 374). Dr. Capulong reviewed these findings with Ms. Santiago. (Tr. 389). Ms. Santiago endorsed the same pain symptoms and described the pain as aching, throbbing, and occasionally shooting. (*Id.*). He noted a negative Spurling's test and no myelopathy or weakness. (*Id.*). Dr. Capulong suggested continuing conservative medication treatment and, if the pain persisted, Ms. Santiago could schedule a medial branch block and right shoulder intraarticular injection. (Tr. 392).

Lumbar spinal imaging revealed moderate narrowing of the L5 disc with "possibly some mild facet arthrosis on the right at L5-S1." (Tr. 365).

In September 2018, Ms. Santiago met with Sanjay Kumar, D.O., to discuss her neck, shoulder, and back pain. (Tr. 434). Ms. Santiago complained of chronic low back pain and pain in

her upper left buttock, described as achy, sharp, and worse in the morning. (*Id.*). Dr. Kumar noted Ms. Santiago's pain was in her left sacroiliac joint and referred her for therapy.

In October 2018, Dr. Kumar prescribed a sacroiliac belt, designed to reduce pain by reducing trunk mobility and supporting weak spinal musculature. (Tr. 441).

On November 2, 2018, Ms. Santiago saw certified nurse practitioner Kathy Daizell in Dr. Kumar's office. She complained of low back, neck, and right shoulder pain. (Tr. 411). On physical examination, Ms. Santiago displayed decreased range of motion, tenderness, and pain in her cervical and lumbar spine. (Tr. 414).

On November 30, 2018, Ms. Santiago followed up with nurse practitioner Daizell for back, neck, and shoulder pain. (Tr. 480). On physical examination, Ms. Santiago displayed decreased range of motion and tenderness in her lumbar spine and pain over her sacroiliac joint with provocative maneuvers. (Tr. 483).

On December 28, 2018, Ms. Santiago met with nurse practitioner Daizell and endorsed pain with any activity and noted that gabapentin "helps the pain relief but doesn't last long." (Tr. 474). She exhibited decreased range of motion and tenderness along the facet joints in her lumbar and cervical spine and right shoulder. (Tr. 476). Spurling's and straight leg raise tests were negative. (*Id.*).

In December 2018 and January 2019, Ms. Santiago received lumbar facet joint injections. (Tr. 471, 478-79).

In February 2019, Ms. Santiago met with nurse practitioner Daizell at Dr. Kumar's office and complained of back, neck, and shoulder pain. (Tr. 456). She exhibited decreased range of

motion and tenderness along the facet joints in her lumbar and cervical spine and right shoulder.
(Tr. 459). Spurling's and straight leg raise tests were negative. (*Id.*).

In March 2019, Ms. Santiago met with nurse practitioner Daizell at Dr. Kumar's office to
receive medication refills and review a lumbar MRI, which showed degenerative changes at L5-S1
due to facet arthropathy. (Tr. 450-51, 453). She exhibited decreased range of motion and
tenderness in her cervical spine but was otherwise normal on physical examination. (Tr. 454).

Ms. Santiago met with Dr. Kumar again on April 16, 2019, where she complained of
continued low back, neck, and shoulder pain. (Tr. 446). Ms. Santiago stated prolonged activities
bother her, especially bending and lifting, and she must shift around often. (*Id.*). Dr. Kumar noted
Ms. Santiago's strength, balance, and coordination remained functional for ambulation. (Tr. 449).
Noting Ms. Santiago had failed conservative treatment, Dr. Kumar ordered lumbar medical branch
blocks and discussed radiofrequency ablation. (*Id.*). On April 30, and May 13, 2019, Ms. Santiago
received lumbar medial branch blocks. (Tr. 438, 443).

IV.    MEDICAL OPINIONS

A.    **State Agency Medical Consultants**

State agency medical consultants determined Ms. Santiago was not disabled at the initial
and reconsideration levels of the administrative review process. (Tr. 61-71, 73-84). At the initial
level, the medical consultant reviewed records from September 2016 to April 2018. (Tr. 65). The
consultant assessed Ms. Santiago's residual functional capacity and determined she can lift up to
twenty pounds occasionally, ten pounds frequently; can stand, walk, and sit for about six hours in
an eight-hour workday; can occasionally climb ramps and stairs; can never climb ladders, ropes, or
scaffolds; can frequently kneel, crouch, and crawl; can frequently reach and perform fine and gross

manipulations with the right upper extremity; and should avoid concentrated exposure to hazards such as machinery and unprotected heights. (Tr. 68-69).

At the reconsideration level, the medical consultant reviewed new records through August 2018. (Tr. 78). The consultant did not consider any of the medical evidence from Ms. Santiago's providers to constitute a medical source opinion. (Tr. 79). The consultant concluded that the initial level residual functional capacity assessment remained consistent with the newly reviewed evidence and adopted the same residual functional capacity. (Tr. 82).

### B.    Dr. Edwin Capulong

Although the agency medical consultants did not consider medical evidence from Dr. Capulong as a medical source opinion, the ALJ analyzed it as such. (*See* Tr. 27). Dr. Capulong completed a questionnaire with a description of Ms. Santiago's symptoms and his pertinent clinical findings, diagnostic testing, and treatment. (Tr. 370-71). When asked to describe with specificity her ability to sit, stand, walk, bend, stoop, lift, and grasp, Dr. Capulong provided the following: "Persistent/worsening sharp-burning sensation from right shoulder down to hand. Worsening with lifting and picking up objects." (Tr. 371).

## V.    OTHER RELEVANT EVIDENCE

Ms. Santiago completed an Adult Function Report describing how her impairments limit her activities. (Tr. 222-29). Ms. Santiago lives in a house with her husband. (Tr. 222). Ms. Santiago is always in pain. (*Id.*). She is unable to grasp items in her hands because they get numb. (*Id.*). The pain in her neck, shoulder, and hand is constant. (*Id.*). She takes medication but the pain never goes away. (*Id.*).

Ms. Santiago's typical day begins with a shower, breakfast, and medication. (Tr. 223). She naps after taking her medications. (*Id.*). When she wakes up, Ms. Santiago's husband helps her with household tasks. (*Id.*). Ms. Santiago used to cook complete meals but is now limited to making simple meals, such as sandwiches and frozen foods. (Tr. 224).

Ms. Santiago testified that her impairments disrupt her sleep; she wakes up in pain when her medication wears off. (Tr. 223). She needs assistance getting dressed when wearing clothing like sweaters and dresses. (*Id.*). She is unable to blow dry her own hair. (*Id.*). Ms. Santiago's husband and daughter help her with all housework and yardwork because her neck, shoulder, and hand are always in pain. (Tr. 224-25). She requires help reaching, holding, and carrying items. (Tr. 224).

Ms. Santiago goes outside about once a week. (Tr. 225). Her husband or daughter usually drive unless there is an emergency or an extreme need for Ms. Santiago to drive. (*Id.*). Ms. Santiago shops in stores and by computer for groceries, household, and personal care products. (*Id.*). She does this twice a month and takes about an hour or two. (*Id.*). Ms. Santiago does not  spend time with others and does not go anywhere on a regular basis. (Tr. 226). Her pain limits her ability to participate in social activities. (Tr. 227).

Ms. Santiago's impairments affect her ability to lift, reach, sit, and use her hands because her hands get numb and are always in pain. (*Id.*). Ms. Santiago estimates she can walk for up to a half hour before needing to stop and rest. (*Id.*). She does not handle stress well and needs time to adapt to changes. (*Id.*).

11

## THE ALJ'S DECISION

The ALJ's decision, dated July 15, 2019, included the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2. The claimant has not engaged in substantial gainful activity since October 31, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: spine disorders, dysfunction of the major joints, and obesity (BMI 31.89) (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can frequently reach with the right upper extremity. She can frequently perform fine and gross manipulation with the right upper extremity. She can occasionally climb ramps and stairs. She can never climb ropes, ladders, or scaffolds. She can frequently kneel, crouch, or crawl. She should avoid concentrated exposure to hazards such as industrial machinery and unprotected heights. She has the ability to work where English proficiency is not required but is understood and can be spoken to some degree.

6. The claimant is capable of performing past relevant work as a customer complaint clerk, DOT# 241.367-014, which is sedentary with an SVP of 5 and check cashier, DOT# 211.462-026, which is sedentary per the DOT and was performed as light with an SVP of 3. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from October 31, 2016, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 23-28).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of

13

evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

14

5.      Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Ms. Santiago alleges the ALJ's residual functional capacity assessment is not supported by substantial evidence for a variety of reasons. (Pl.'s Br., ECF #12, PageID 555-71). She claims the ALJ did not properly analyze the medical opinions. With respect to Dr. Capulong's opinion, Ms. Santiago argues the ALJ did not provide the requisite "good reasons" for failing to assign weight to a treating physician's opinion, precluding meaningful judicial review. (*Id.* at 564-65, 567). With respect to the state agency medical consultants' opinions, Ms. Santiago argues the ALJ "cannot rely upon the opinions of the reviewing doctors, [*sic*] who did not review 105 pages of material medical records." (*Id.* at 567). Lastly, Ms. Santiago is dissatisfied with the ALJ's residual functional capacity assessment that limits her to frequent reaching and performing fine and gross manipulations, and argues the evidence supports a finding that Ms. Santiago can perform less than occasional reaching and manipulation. (*Id.* at 569-70).

15

The Commissioner responds that the evaluation of medical opinions in this matter is not subject to the treating-physician rule (as Ms. Santiago maintains) and argues that Dr. Capulong's questionnaire simply rehashes Ms. Santiago's subjective allegations. (Comm'r's Br., ECF #15, PageID 666, 670). As it relates to the state agency medical consultants' opinions, the Commissioner responds that an ALJ is permitted to rely on opinions where the subsequent medical evidence does not undermine the earlier assessments and that, here, the ALJ found the consultants' opinions persuasive based on a consideration of the evidence as a whole. (*Id.* at 673). Lastly, the Commissioner argues the ALJ's residual functional capacity assessment is supported by substantial evidence and points to the consultants' opinions in support. (*Id.* at 674).

### A.     The ALJ appropriately analyzed the medical opinion evidence.

Under 20 C.F.R. § 404.1520c, for claims filed on or after March 27, 2017, the ALJ is to articulate "how persuasive [she] find[s] all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. § 404.1520c(b). The ALJ is not required to defer to or give any specific evidentiary weight to a medical opinion, and is not required to give a treating source controlling weight. *Id.* at § 404.1520c(a). Instead, the ALJ must articulate the consideration given to the medical opinions in the record, grounded in the two "most important factors"—supportability[1] and consistency.[2] *Id.* at § 404.1520c(b). The regulations

---

[1]     "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his medical opinion(s) or prior administrative medical finding(s), the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

[2]     "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the opinion(s) and finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2).

define a medical opinion as "a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions" in the ability to perform physical demands of work activities, the ability to perform mental demands of work activities, the ability to perform other demands of work, and the ability to adapt to environmental conditions. 20 C.F.R. § 404.1513(a)(2).

The ALJ determined Dr. Capulong's opinion, that Ms. Santiago's pain worsened with lifting and picking up objects, was less persuasive "because it was rather vague and not expressed in vocationally relevant terms. However, it is generally consistent with the evidence showing only mild findings." (Tr. 27).

I find the ALJ's evaluation of Dr. Capulong's questionnaire is supported by substantial evidence. Dr. Capulong's opinion does not offer any specific limitations or opinion regarding the extent to which Ms. Santiago's ability to perform basic work activities is affected. Rather, Dr. Capulong's opinion merely recited Ms. Santiago's subjective symptoms. Courts have upheld an ALJ's discounting of a medical source opinion on the grounds that it is vague. *See Ritter v. Comm'r of Soc. Sec.*, No. 1:12-cv-122, 2013 WL 427572, at *5 (S.D. Ohio Feb. 4, 2013) (finding no error in failing to address a medical opinion that was "vague and [did] not specify any quantifiable or other particular physical . . . . limitations associated with plaintiff's impairments."), *report and recommendation adopted*, No. C-1-12-122, 2013 WL 1281738 (S.D. Ohio Mar. 26, 2013); *Acosta v. Comm'r of Soc. Sec.*, No. 17-12414, 2018 WL 7254256, at *9-10 (E.D. Mich. Sept. 6, 2018), *report and recommendation adopted*, No. 17-12414, 2019 WL 275931 (E.D. Mich. Jan. 22, 2019) (holding that treating physician's "vague" opinions could not be "translate[d] into functional limitations that [could] be properly incorporated into an RFC," because, *e.g.*, the opinion did not explain how

plaintiff was limited or whether she could only do certain activities for a certain amount of time each day"); *Bennett v. Comm'r of Soc. Sec.*, No. 1:07-CV-1005, 2011 WL 1230526, at *4 (W.D. Mich. Mar. 21, 2011) (upholding ALJ's decision discounting physician's vague opinion), citing *Tempesta v. Astrue*, No. CV-08-00003 (FB), 2009 WL 211362, at *7 (E.D.N.Y. Jan. 28, 2009) (characterizing treating physician's opinion as "vague" and of little value).

The Commissioner correctly points out that the Sixth Circuit has repeatedly recognized an ALJ's authority to discount a response when it simply restates a claimant's subjective allegations. *E.g.*, *Bolton v. Comm'r of Soc. Sec.*, 730 Fed. Appx. 334, 337 (6th Cir. 2018) ("the statements that Bolton attributes to Dr. Schack and the specific exertional limitations that were allegedly proposed by Dr. Simons were merely their recitations of Bolton's complaints rather than their medical opinions"); *Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011) ("Dr. Killefer's pain-related statement . . . . is not a 'medical opinion' at all—it merely regurgitates Francis's self-described symptoms."); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 391 (6th Cir. 2004) ("Dr. Sonke's conclusion regarding the amount of weight that Warner could lift regularly appears to be based not upon his own medical conclusion, but . . . Warner's own assessment of his weight-lifting limitations").

Despite Ms. Santiago's insistence to the contrary, Dr. Capulong's opinion was vague – it failed to specify any functional limitations in the context of her ability to perform basic work activities and simply repeated Ms. Santiago's subjective symptoms. The ALJ's evaluation of Dr. Capulong's opinion is, therefore, supported by substantial evidence.

Ms. Santiago next argues the ALJ erred in relying on the state agency consultants' opinions because the consultants did not review 105 pages of material medical records from Dr. Kumar and Dr. Kolp. This argument is unavailing.

An ALJ does not err in relying on the state agency consultants' opinions that were not based on the complete medical record, so long as the ALJ considers the evidence subsequent to the consultants' opinions. *See, e.g., McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 32 (6th Cir. 2009); *Patterson v. Comm'r of Soc. Sec.*, No. 1:16cv110, 2017 WL 914272, at *10 (N.D. Ohio Mar. 8, 2017). Here, the ALJ's written decision did consider and discuss all the medical records not previously reviewed by the state agency consultants. (Tr. 26). Thus, the ALJ's evaluation of the state agency consultants' opinions are supported by substantial evidence.

### B. The ALJ's residual functional capacity assessment is supported by substantial evidence.

The ALJ alone is responsible to form a residual functional capacity appropriate to the claimant's abilities, supported by the ALJ's evaluation of the medical evidence. *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004). The residual functional capacity is an assessment of the claimant's remaining capacity for work, once the claimant's limitations have been considered. *Id.* at 632. An ALJ must consider all evidence in the record to evaluate the limiting effects of the claimant's symptoms, including daily activities, the nature of the alleged symptoms, efforts made to alleviate the symptoms, the type and efficacy of treatments, and other factors regarding the claimant's functional limitations. *Avery v. Comm'r of Soc. Sec.*, No. 1:19-CV-1963, 2020 WL 2496917, at *11 (N.D. Ohio May 14, 2020). The ALJ also must determine the "extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record." *Id.* An ALJ "is only required to incorporate those limitations

19

which he has deemed credible" and may reject limitations or impose more restrictions. *Gant v. Comm'r of Soc. Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Doing so does not mean a residual functional capacity assessment is not supported by substantial evidence. *Ross v. Comm'r of Soc. Sec.*, No. 14-11144, 2015 WL 1245830, at *11 (E.D. Mich. Mar. 18, 2015). An ALJ may also rely on a VE's testimony in reaching this conclusion, so long as it accounts for the claimant's limitations. *Webb*, 368 F.3d at 633.

Ms. Santiago claims it is unclear why the ALJ's residual functional capacity assessment limits her to frequent reaching and performing fine and gross manipulations with the upper right extremity. To the contrary, the ALJ stated the residual functional capacity assessment "is supported by the objective diagnostic evidence, examination findings, and the opinions of the state agency consultants." (Tr. 27). More specifically, the ALJ's written decision noted the mild diagnostic findings, including mild cervical degenerative changes and an EMG showing mild median neuropathy at the wrist. (Tr. 27). I also note the physical examinations consistently failed to show upper extremity weakness or abnormal neurological findings; additionally, no medical opinion supports greater functional limitations.

The ALJ's residual functional capacity assessment, which incorporated limitations supported by the mild findings in the medical record, is, therefore, supported by substantial evidence.

CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I find the Commissioner's decision denying DIB is supported by substantial evidence. Therefore, I recommend the District Court **AFFIRM** the Commissioner's decision.

Dated: November 22, 2021

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985)Dated: November 17, 2021.